UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JUAN PERNELL VERRETTE                                CIVIL ACTION

VERSUS                                               NO. 08-1200

CHARLOTTE RANDOLPH -                                 SECTION: "F"(1)
LAFOURCHE PARISH PRESIDENT, ET AL.

## REPORT AND RECOMMENDATION

Plaintiff, Juan Pernell Verrette, a state prisoner incarcerated at the Lafourche Parish Detention Center, filed this *pro se* complaint pursuant to 42 U.S.C. § 1983 against Lafourche Parish President Charlotte Randolph, the Lafourche Parish Government, Sheriff Craig Webre, and Warden Eddie Rodriguez. In this lawsuit, plaintiff asserts numerous claims challenging the conditions of his confinement.

The undersigned United States Magistrate Judge was unable to obtain the required consent of all parties to proceed to trial pursuant to 28 U.S.C. § 636(c) and advised the United States District Judge of that fact.[1] Thereafter, the matter was referred to the undersigned for an evidentiary hearing

---

[1] Rec. Doc. 24.

and submission of proposed findings of fact and recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).[2]

The evidentiary hearing in this matter was held on October 8, 2008, with plaintiff attending in person. At that hearing, plaintiff testified and introduced documents into evidence. He additionally presented the testimony of four fellow inmates, Clarence Matthews, III, Pyrell Duncan, Paul Dufrene, and Junius Thompson, who appeared by telephone, and one correctional officer, John Foote, who appeared in person. The defendants likewise introduced documents into evidence and presented the in-person testimony of four witnesses: Dwayne Thibodeaux, Brennan M. Matherne, Shelly J. Toups, and Lieutenant Cortrell Davis. Much of the testimony was unnecessary for the resolution of the claims asserted in this lawsuit and, accordingly, the witnesses' testimony will not be recounted in full.[3] Rather, the undersigned will reference only the relevant portions of the testimony in connection with the discussion herein of plaintiff's claims, which are as follows:

1. Plaintiff has been denied adequate legal assistance in connection with his prosecution of two pending civil rights cases;

2. Plaintiff has been housed in an overcrowded, dangerous, and racist environment;

3. The plumbing backs up in plaintiff's dorm, and he has been denied adequate cleaning supplies to deal with the results;

---

[2] Rec. Doc. 34.

[3] However, the evidentiary hearing was recorded in its entirety and that recording is available if necessary for review or transcription.

4.  Plaintiff has been exposed to infectious diseases;

5.  Plaintiff has been denied publications concerning his religion;

6.  Defendants are unlawfully collecting sales taxes on commissary items;

7.  Plaintiff was forced to sleep on a mattress on the floor due to an insufficient number of bottom bunks being available; and

8.  The jail's grievance procedure is inadequate.

## Plaintiff's Motion for Preliminary Default

Before turning to the merits of plaintiff's claims, the Court notes that plaintiff filed a motion for entry of default, Rec. Doc. 15, against Sheriff Webre and Warden Rodrigue. That motion, which remains pending, should be denied.

Federal law provides that, until ordered to do so by the Court, a defendant is under no obligation to reply to an action filed by a prisoner. 42 U.S.C. § 1997e(g)(1). On May 6, 2008, the Court did in fact order Webre and Rodrigue to file responsive pleadings;[4] however, their time for doing so had not expired when plaintiff filed his motion for entry of default on or about May 14, 2008. Accordingly, Webre and Rodrigue were not in default at that time. Further, they subsequently filed an answer and have vigorously defended this lawsuit.

## Inadequate Legal Assistance

In the complaint, plaintiff states:

5.  Plaintiff has civil rights suits pending in Western District entitled Verrette v. Kiatonia J. Major, et al. #5:07-cv-547-P and Eastern District Verrette v. Richard Stalder et al. # 2:07-cv-9202 to which I needed legal assistance in drafting and service of necessary motions, pleadings and oppositions to

---

[4] Rec. Doc. 11.

3

> which I have no working legal knowledge to prosecute these suit nor does defendants provide legal assistance.

It is clear that inmates have a constitutional right of meaningful access to the courts, which includes a right of access to law libraries or assistance from legally trained personnel necessary to file nonfrivolous legal claims challenging their convictions or conditions of confinement. Bounds v. Smith, 430 U.S. 817, 828 (1977); Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999). However, claims alleging violations of that right are not cognizable unless the prisoner's position as a litigant was prejudiced by the denial of access. See, e.g., Chriceol v. Phillips, 169 F.3d 313, 317 (5th Cir. 1999); Ruiz v. United States, 160 F.3d 273, 275 (5th Cir. 1998); McDonald v. Steward, 132 F.3d 225, 230-31 (5th Cir. 1998); Walker v. Navarro County Jail, 4 F.3d 410, 413 (5th Cir. 1993). "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Lewis v. Casey, 518 U.S. 343, 351 (1996).

As to plaintiff's civil action in the Western District, attorney Douglas L. Harville was appointed to represent plaintiff in that case. Verrette v. Major, Civ. Action No. 07-0547 (W.D. La. Mar. 6, 2008). The appointment of counsel satisfies an inmate's right of access to courts; in those circumstances, he is not additionally entitled to independent access to a law library and legal materials. Storseth v. Spellman, 654 F.2d 1349, 1353 (9th Cir. 1981); Sosa v. Strain, Civ. Action No. 06-9040, 2007 WL 1521441, at *6 n.8 (E.D. La. May 22, 2007); Buckenburger v. Strain, Civ. Action No. 06-5670, 2006 WL 4503353, at *3 (E.D. La. Oct. 20, 2006); Kirkpatrick v. Daughtery, Civ. Action No. 6:05cv461, 2006 WL 2401108, at *4 (E.D. Tex. Aug. 17, 2006); Rivera v. Leaming, No. 99-3067, 2000 WL 382035, at *11 (D. Kan. Apr. 5, 2000). Accordingly, because plaintiff is

represented by counsel in his lawsuit in the Western District, he has no viable access-to-courts claim with respect to that civil action.

As to Civil Action No. 07-9202 filed in this District, plaintiff has been able to file a complaint and amend it twice. Chief Magistrate Judge Alma Chasez has held a conference in that case to thoroughly explore the nature and factual bases of plaintiff's claims and has his ordered his medical records for the Court's review. Both of plaintiff's claims in that case remain under consideration by the Court, and plaintiff simply cannot show that he has suffered any prejudice in the case as a result of the alleged inadequacies prison's law library or legal assistance program. Accordingly, he likewise has no viable access-to-courts claim with respect to that civil action.

<u>Overcrowded, Dangerous, and Racist Environment</u>

In the complaint, plaintiff states:

6.  Plaintiff is being housed in an overcrowded medical dorm (m/s) with psychiatric, non-medical, aggressive and Dept of Corrections (already violated) prisoners with several sleeping on the floor to which I was recently attacked and injured on the 4th day of February, 2008 by someone who didn't want to be housed thereon or needed to be.

....

8.  Plaintiff is losing sleep and weight is going up and down due to the overcrowding and fear for his safety in a supposedly medical dorm (m/s) that's being ran as a protective custody and psychiatric unit as well.

....

10. Plaintiff is housed in a dangerously racist environment.

When a convicted inmate challenges the conditions of his confinement, his claims are analyzed under the Eighth Amendment. With respect to such claims, the United States Fifth Circuit Court of Appeals has held:

> The Eighth Amendment dictates that cruel and unusual punishment shall not be inflicted, and it is applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.
> The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. This circuit has worded the test as requiring extreme deprivation of any "minimal civilized measure of life's necessities." ... The Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society" and not the standards in effect during the time of the drafting of the Eighth Amendment.

Gates v. Cook, 376 F.3d 323, 332-33 (5th Cir. 2004) (citations omitted).

To the extent that plaintiff is complaining that the medical unit where he is housed is overcrowded, that fact was confirmed by his witnesses and even tacitly acknowledged by Lieutenant Cortrell Davis, the jail's acting warden. The evidence showed that the medical unit has only sixteen bunks but at times houses twenty-three or more inmates. However, that alone does not entitle plaintiff to relief because it is clear that the mere fact that a prisoner is confined in an overcrowded conditions does not in and of itself amount to a constitutional deprivation. See, e.g., Castillo v. Cameron County, Texas, 238 F.3d 339, 354 (5th Cir. 2001) ("[A]lthough overcrowding may give rise to unconstitutional conditions, overcrowding itself is not per se unconstitutional."); Kelly v. Gusman, Civ. Action No. 07-611, 2007 WL 2007992, at *3 (E.D. La. July 5, 2007).

Plaintiff, however, further contends that the overcrowding has created a *dangerous* environment on the medical unit, especially in light of the racial imbalance in the population housed on the unit.[5]  Regarding such claims, the United States Fifth Circuit Court of Appeals has held:

> It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates. ... [A]n inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to an inmate's safety. An official acts with the requisite deliberate indifference if he is aware of an excessive risk to inmate safety and disregards that risk. In this context, an officer's awareness of the risk is evaluated subjectively. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must in fact also have drawn the inference. No liability exists, however, if an official reasonably responded to a known substantial risk, even if the harm was ultimately not averted.

Longoria v. Texas, 473 F.3d 586, 592-93 (5th Cir. 2006) (citations, footnote, quotation marks, brackets, and ellipsis omitted). Further, "deliberate indifference must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998); Dangerfield v. Dyson, Civ. Action No. 05-0650, 2008 WL 718114, at *3 (E.D. La. Mar. 14, 2008).

In support of this claim, plaintiff and his witnesses testified at the evidentiary hearing regarding the fights which occasionally occur on the medical unit. While this Court does not doubt that such incidents occur at times, it does not necessarily follow that defendants have violated the federal constitution in failing to prevent all such occurrences. To the contrary, the Eighth Amendment mandates only "reasonable" safety, not "absolute" safety, in prisons. Wolters v.

---

[5] Plaintiff and his witnesses testified that, although the jail's general population is primarily African-American, the population housed in the medical unit is overwhelmingly Caucasian. Lieutenant Davis confirmed this racial mix.

Federal Bureau of Prisons, No. 08-CV-0837, 2008 WL 4558346, at *2 (W.D. La. Sept. 19, 2008) (Kirk, M.J.) (adopted by Drell, J., on October 9, 2008). Further, to require "absolute safety" would ask the impossible of prison administrators:

> [I]t is doubtful that inmate against inmate violence can ever be prevented within a prison setting no matter how carefully a prison might be operated. Courts must comprehend the magnitude of the prison administrators' problem and recognize the distinctly unique situation caused by confining human beings in a tension-filled atmosphere. Inmate assaults upon inmates are not unusual in the best run prisons.

Campbell v. Anderson, 335 F.Supp. 483, 486 (D. Del. 1971); see also Farmer v. Brennan, 511 U.S. 825, 858-89 (Thomas, J., concurring) (noting that "[p]risons are necessarily-dangerous places" which "house society's most antisocial and violent people in close proximity with one another" and that "some level of brutality ... among prisoners is inevitable no matter what the guards do unless all prisoners are locked in their cells 24 hours a day and sedated") (quotation marks, brackets, and ellipsis omitted). Indeed,

> [t]his is often the predicament confronting prison officials who must serve as referees, as well as custodians, over incarcerated individuals who are not known for their civility or their ability to negotiate amicably or reasonably with other individuals. Every day prison officials must make decisions as to whether a dispute between two prisoners is a genuine threat to their safety or merely a routine dispute that will soon be forgotten. Sometimes, an official makes an incorrect assessment regarding the seriousness of the situation and someone gets hurt; however, the official is entitled to qualified immunity and cannot be held liable if he made a good faith error.

McKnight v. Livingston, Civ. Action No. H-06-3674, 2007 WL 221926, at *2 (S.D. Tex. Jan. 25, 2007) (citations omitted). In light of the foregoing, the undersigned finds that there is no basis for holding that defendants violated the Eighth Amendment by failing to prevent the random incidents of inmate violence which occasionally occur without warning on the medical unit.

Lastly, at the evidentiary hearing, plaintiff presented testimony concerning not only perceived *dangers* created by the racial imbalance of the population of the medical unit but also regarding perceived generalized racial discrimination by prison officials. This is an improper attempt to go beyond the claim stated in the complaint and need not be addressed.

### Plumbing Problems

In the complaint, plaintiff states that faulty plumbing in medical dorm causes excess water to accumulate on the bathroom floor. He further complains that inmates are given a mop only once per day to deal with the problem. At the evidentiary hearing, plaintiff and his witnesses all testified as to the alleged plumbing problems, agreeing that (1) water collects on the bathroom floor daily causing slippery conditions, (2) inmates are given inadequate supplies to remove the water, and (3) plumbers either never come or are unable to correct the problem.

Dwayne Thibodeaux, a repair technician employed by the parish government, testified for the defense. He stated that he repairs the jail plumbing on a regular basis, often several times per week, when notified of problems by the jail staff.[6] He stated that the medical unit's plumbing

---

[6] Pursuant to Louisiana law, the responsibility for a parish jail is divided between the local governing authority and the sheriff. Put simply, the parish is responsible for financing and maintaining the jail, La.Rev.Stat.Ann. §§ 15:304, 15:702, and 33:4715, while the sheriff is responsible for the day-to-day operation of the jail, La.Rev.Stat.Ann. §§ 15:704 and 33:1435. Fairley v. Stalder, No. 07-30589, 2008 WL 3244022, at *4 (5th Cir. Aug. 6, 2008). Louisiana jurisprudence has interpreted the local government's responsibility regarding maintenance as one merely to fund, not actually provide, the needed maintenance. Actual provision of the maintenance is the responsibility of the parish sheriff. See Griffin v. Foti, 523 So.2d 935, 938-39 (La. App. 4th Cir.), writ denied, 531 So.2d 272 (La. 1988); see also Gorton v. Ouachita Parish Police Jury, 814 So.2d 95, 104 (La. App. 2nd Cir.), writs denied, 823 So.2d 950 (La.) and 823 So.2d 952 (La. 2002). That said, it was clear from the testimony at the evidentiary hearing that both the sheriff's department and the parish government perform maintenance at the Lafourche Parish Detention Center.

system does not leak, as evidenced by the fact that no water collects when facilities are not in use. He opined that any water from the showers results from splashing or from water falling from the shower curtains and, at times, up to one-eighth of an inch may collect on the floor. He testified that although the toilets occasionally leak from the "actuator button" behind the toilet, that problem is fixed when it occurs. He further stated that the toilets do not leak from the seal, and so any water leaking from the toilet is clean water, not sewage. He conceded that a non-functioning area drain in the floor had been cemented closed in one of the two bathrooms in the medical unit;[7] however, he explained that it was not the actual shower drain and that the shower drain functions normally. He also testified that all of the drain systems in the jail are connected, so that a blockage in another part of the jail can result in a blockage in the medical unit.

Lieutenant Cortrell Davis, the jail's acting warden, testified that inmates in other parts of the jail intentionally damage the plumbing, thereby causing blockages requiring repair. He stated that the parish government has always been responsive to requests for plumbing repairs. He further noted that the board of health approved the facility after the floor drain was cemented closed in the medical unit's bathroom.

Based on the evidence presented, the Court is convinced that water collects on the bathroom floor, either as a result of leaks or, more probably, flawed designed. Whatever the cause, however, plaintiff has not established that the water is anything more than an annoyance. As previously noted, "[t]he Constitution ... does not mandate comfortable prisons, and only those deprivations denying

---

[7] He explained that the area drain was connected to a broken pipe and was, therefore, useless. Accordingly, the drain was simply cemented closed to avoid inmates possibly tripping over the opening.

10

the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted). Minor inconveniences such as a wet bathroom floor simply do not qualify.

To the extent that plaintiff is arguing that the plumbing problem creates an *unsanitary* condition, he has not meet his burden of proof with respect to that contention. As noted, Thibodeaux testified that the water that collects on the floor was clean water, not sewage. Plaintiff has failed to show otherwise. There is no basis in the record for concluding that the water poses a sanitation hazard.[8]

Lastly, the Court rejects any contention that the condition poses a safety hazard due to the possibility that prisoners may slip in the water. It is not sufficient for plaintiff merely to prove that slippery conditions exist. Rather, as noted above, a prisoner asserting a failure-to-protect claim must show that the defendants were deliberately indifferent to a danger that posed a *substantial risk* of serious harm. Where, as here, the inmate is *aware* of a condition which at times causes water to collect on the floor, and can therefore avoid the "danger" simply by exercising reasonable caution, arguably the existence of the water does not pose a *substantial risk* of serious harm. However, in any event, even *if* the water posed a substantial risk of serious harm, prison officials have not reacted

---

[8] This is especially true in light of the jurisprudence which has found considerably more egregious conditions constitutionally acceptable. See, e.g., Davis v. Scott, 157 F.3d 1003 (5th Cir. 1998) (no constitutional violation found where prisoner alleged that he was housed for three days in a "filthy" cell with "blood on the walls and excretion on the floors"); Smith v. Copeland, 87 F.3d 265, 268-69 (8th Cir. 1996) (prisoner who was housed for four days in cell with raw sewage from an overflowing toilet failed to state an Eighth Amendment claim); Whitnack v. Douglas County, 16 F.3d 954 (8th Cir. 1994).

11

with deliberate indifference; rather, the evidence shows that plumbing repairs are routinely made as needed and the inmates testified that they are given a mop on a daily basis to remove any standing water. The mere fact that the officials' efforts have not been entirely successful in correcting the problem is not determinative; lack of success does not equate to deliberate indifference. See, e.g., Johnson v. Johnson, 385 F.3d 503, 524 (5th Cir. 2004) (if an official responds reasonably to a known risk, he can not be held liable even if the harm was not ultimately averted).

Exposure to Infectious Diseases

In the complaint, plaintiff states:

9. Plaintiff is being exposed to co-inmates' contagious and infectious diseases due to overcrowding and no policy in effect to test and screen incoming prisoners for the same; on or about the 3 day of November 2007 plaintiff wrote grievance to Warden E. Rodrigue regarding another medical dorm (m/s) inmate having been diagnosed with shingles – whereupon inmate (shingles) was temporarily quarantined but later that nite allowed to return to shower on medical dorm (m/s) without any cleaning supplies before or after his shower.

The Court finds this claim has no merit. To the extent that plaintiff is complaining that incoming inmates are not *routinely* tested for infectious diseases, no such screening of all inmates is constitutionally required. See Gibbs v. Grimmette, 254 F.3d 545, 550 (5th Cir. 2001); Kennedy v. Gusman, No. 06-5274, 2007 WL 1302554, at *3 (E.D. La. May 2, 2007). To the extent that plaintiff is complaining that the defendants failed to protect him in a particular circumstance due to their failure to conduct such screening, he, again, must show that, due to a prison official's

subjective deliberate indifference, plaintiff was subjected to a danger posing a *substantial risk* of *serious harm*. Plaintiff simply has not made that showing in this case.[9]

## Denial of Religious Publication

Plaintiff, who is Muslim, next complains that he was wrongly denied access to a religious publication, The Muslim Journal, while Christian inmates were allowed to have similar publications regarding their faith.

It is clear that the First and Fourteenth Amendments require that an inmate be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners to adhere to conventional religious precepts." Cruz v. Beto, 405 U.S. 319, 322 (1972). Therefore, absent evidence that a particular publication poses a valid security concern,[10] a Muslim inmate should be allowed access to publications regarding his faith in the same manner that inmates of other faiths are allowed access to similar publications regarding their faiths. Walker v. Blackwell, 411 F.2d 23, 29 (5th Cir. 1969).

---

[9] Moreover, federal law provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Plaintiff has not demonstrated that he suffered a physical injury resulting from such exposure, and it is clear that mere feelings of fear and anxiety do not qualify as physical injuries under § 1997e(e). Herman v. Holiday, 238 F.3d 660, 665-66 (5th Cir. 2001). Accordingly, in any event, he would barred from collecting compensatory damages on this claim.

[10] For example, a prison may restrict access to publications which have the potential for inciting violence. See, e.g., Chriceol v. Phillips, 169 F.3d 313, 316 (5th Cir. 1999).

Based on the evidence presented at the evidentiary hearing, it is clear that there was a delay in plaintiff receiving <u>The Muslim Journal</u> at the Lafourche Parish Detention Center based on two misunderstandings, one on the part of prison officials and one on the part of plaintiff.

The first misunderstanding apparently arose due to the journal's format. Officer John Foote testified that inmates at the Lafourche Parish Detention Center generally are not permitted to possess newspapers. Because <u>The Muslim Journal</u> is printed in newspaper form, it was apparently originally thought to run afoul of that general ban. However, once prison officials were made aware that it was a religious publication, it was exempted from the general ban.

The second misunderstanding arose when plaintiff misinterpreted a response to a grievance. In an administrative grievance dated February 21, 2008, plaintiff complained that he was being denied access to the journal. On March 7, 2008, Major Marty Dufrene responded:

> In response to the allegations of this grievance, you are not being denied access to religious literature. However, the example you provided requires a subscription. Therefore, you will have to request a family member or friend to subscribe to this journal & have it delivered to the Detention Center. Once it arrives at the Detention Center, the Rules & Regulations of Inmate mail shall apply.[11]

Plaintiff interpreted that response as prohibiting him from having the journal mailed to him the detention center; rather, he believed officials were requiring that a relative or friend obtain a copy of the journal and then *hand-deliver* it to the detention center.[12] However, at some point thereafter,

---

[11] That grievance was introduced at the hearing as Exhibit No. 1 by Webre and Rodrigue.

[12] Plaintiff stated this interpretation in a subsequent appeal to Sheriff Webre, a copy of which was introduced as Exhibit No. 2 by Webre and Rodrigue, and plaintiff reiterated at the hearing that this was his interpretation.

14

that misunderstanding was resolved. Plaintiff then subscribed to the journal, and it is in fact regularly mailed by the publisher directly to plaintiff at the jail.

In light of the foregoing, the undersigned finds that plaintiff has failed to present any evidence whatsoever that he was subjected to intentional discrimination due to his religion.

Out of an abundance of caution, the Court notes that plaintiff also testified that, on a single occasion, an inexperienced officer apparently unaware of the jail's policy found and destroyed two copies of The Muslim Journal during a shakedown of plaintiff's cell. However, that officer has not been named as a defendant, and the supervisory officials who were named as defendants herein cannot be liable under any theory of strict liability[13] or vicarious liability[14] for federal civil rights violations allegedly committed by a subordinate. Lastly, to the extent that plaintiff means to hold Sheriff Weber and Warden Rodriguez liable under a theory that they failed to adequately train the officer in question, that claim also fails. The United States Fifth Circuit Court of Appeals has held:

> A [supervisory official] not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: 1) the [supervisory official] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

---

[13] Harris v. Greer, 750 F.2d 617, 618 (7th Cir. 1984) ("[T]here is no concept of supervisor strict liability under section 1983."); see also Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996); Evans v. Gusman, Civ. Action No. 08-703, 2008 WL 2223281, at *2 (E.D. La. May 23, 2008); Castillo v. Blanco, Civ. Action No. 07-215, 2007 WL 2264285, at *5 (E.D. La. Aug. 1, 2007).

[14] An official cannot be held liable pursuant to 42 U.S.C. § 1983 under any theory of vicarious liability. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987); see also Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or *respondeat superior* liability."); Evans, 2008 WL 2223281, at *2.

Thompson v. Upshur County, Texas, 245 F.3d 447, 459 (5th Cir. 2001); see also Gates v. Texas Department of Protective and Regulatory Services, 537 F.3d 404, 435 (5th Cir. 2008). However, the Fifth Circuit has explained:

> Deliberate indifference requires more than a showing of negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a *pattern of violations* and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation.

Estate of Davis *ex rel.* McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005) (emphasis added; footnotes and quotation marks omitted); see also Thompson, 245 F.3d at 459 ("Proof of *more than a single instance* of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference.") (emphasis added). "[M]ere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." Roberts v. City of Shreveport, 397 F.3d 287, 293 (5th Cir. 2005).

## Taxing of Commissary Items

Plaintiff next claims that his rights have been violated because sales taxes are charged when he makes purchases from the jail commissary.

It is undisputed that the commissary collects sales taxes. At the evidentiary hearing, Lieutenant Cortrell Davis testified that the commissary recently began charging sales tax after being told that it was required by law. However, Davis stressed that the commissary is *not* operated by the jail; rather, it is run by a national private company, Tiger Commissary, which is responsible for collecting and remitting the sales taxes to the appropriate governmental agencies. He noted that

neither the sheriff's department nor the detention center benefits in any way from the collection of the sales taxes.

In any event, regardless of who operates the commissary, the collection of sales taxes simply does not violate plaintiff's rights. As Judge Perez of the United States District Court for the Eastern District of Missouri explained in rejecting a similar claim:

> Plaintiff's claim that he should not be charged taxes on commissary items is not cognizable under § 1983. Commissary prices implicate no constitutional right. Because the county provided for the plaintiff's basic necessities (food, shelter, clothing, medical care, etc.), he had no protected property or liberty interest in commissary privileges. Plaintiff has no constitutionally protected interest in commissary privileges or commissary prices and, certainly, no legal basis for demanding that he be offered commissary items tax-free. As such, the complaint is legally frivolous as to this issue.

Poole v. Stubblefield, No. 4:05-CV-1005, 2005 WL 2290450, at *2 (E.D. Mo. Sept. 20, 2005) (citations omitted). Indeed, another federal district court rejected such claims as "patently absurd." Dewhart v. City of Montgomery, No. 2:08-cv-0111, 2008 WL 900911, at *1 (M.D. Ala. Mar. 31, 2008); Tolbert v. City of Montgomery, No. 2:08-cv-108, 2008 WL 819067, at *1 (M.D. Ala. Mar. 25, 2008).

### Lack of Bunks

Plaintiff claims that, on occasion, he has had to sleep on a mattress on the floor because a bunk was not available. At the evidentiary hearing, plaintiff's witnesses testified that prisoners, including plaintiff, often must sleep on the floor due to lack of bunks, although they acknowledged that the prisoners are given the normal mattresses and bedding on those occasions. This testimony was not disputed by the defendants, and the Court finds it credible. Nevertheless, plaintiff's claim has no merit. A prisoner's constitutional rights simply are not violated by the fact that his mattress

17

is placed on the floor, as the Constitution does not require elevated beds. See Mann v. Smith, 796 F.2d 79, 85 (5th Cir. 1986); see also Sanders v. Kingston, 53 Fed. App'x 781, 783 (7th Cir. 2002); Finfrock v. Jordan, No. 95-3395, 1996 WL 726426, at *1 (7th Cir. Dec. 6, 1996); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985); McCarty v. McGee, Civ. Action No. 2:06cv113, 2008 WL 341643, at *3 (S.D. Miss. Feb. 5, 2008); Cooler v. Escambia County Detention Facilities, No. 3:07cv188, 2007 WL 3072418, at *6 (N.D. Fla. Oct. 22, 2007); Warren v. Missouri Department of Corrections, No. 4:06CV1496, 2006 WL 3690751, at *3 (E.D. Mo. Dec. 12, 2006); Fischer v. Ellegood, No. 2:03-cv-453, 2006 WL 2425421, at *9 (M.D. Fla. Aug. 21, 2006), aff'd, 238 Fed. App'x 428 (11th Cir. 2007); Doyle v. Fairman, No. 96 C 2572, 1997 WL 610332, at *2 (N.D. Ill. Sep. 29, 1997); Burrell v. Griffith, 158 F.R.D. 104, 106 (E.D. Tex. 1994); Datz v. Hutson, 806 F.Supp. 982, 989 (N.D. Ga. 1992), aff'd, 14 F.3d 58 (11th Cir. 1994).

### Grievance Procedure

Lastly, plaintiff claims that the grievance procedure at the Lafourche Parish Detention Center is inadequate. That claim is foreclosed by Geiger v. Jowers, 404 F.3d 371 (5th Cir. 2005). In Geiger, a prisoner alleged that prison officials failed to properly investigate his grievances complaining about perceived civil rights violations. The United States Fifth Circuit Court of Appeals held that the claim was frivolous because a prisoner has no federally protected liberty interest in having his grievances investigated and resolved to his satisfaction. Id. at 373-74; see also Propes v. Mays, 169 Fed. App'x 183, 184-85 (5th Cir. 2006); George v. Travis, Civ. Action No. 07-986, 2007 WL 1428744, at *7 (E.D. La. May 10, 2007); Mahogany v. Miller, Civ. Action No. 06-

1870, 2006 WL 4041973, at *1 (E.D. La. Aug. 3, 2006), appeal dismissed, 252 Fed. App'x 593 (5th Cir. 2007).

## RECOMMENDATION

It is therefore **RECOMMENDED** that plaintiff's motion for entry of default, Rec. Doc. 15, be **DENIED**.

It is **FURTHER RECOMMENDED** that plaintiff's claims be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-second day of October, 2008.

        **SALLY SHUSHAN**
        **UNITED STATES MAGISTRATE JUDGE**